The next case we're going to hear today is United States v. Taylor and I guess Mr. Berman, whenever you're ready, we'll hear from you first. Thank you, Your Honor, I'm Stuart Berman, appointed by the court to represent Daniel Percival, number 4453. Your Honor, I'm going to address the issues related to wire fraud, to both defendants, and to Tom Zapp, and robbery issues related to Mr. Percival. Mr. Stitchell's representation of Taylor will then address other issues. In terms of the court, Daniel Percival was convicted of three federal crimes, racketeering conspiracy, racketeering, and Tom Zapp. But all three should be reversed on sufficiency grounds, two of them because the government failed to prove the element that gives rise to federal jurisdiction. On count one, the racketeering conspiracy, the jury found the minimum of two racketeering acts, but one of those was wire fraud, and the court should reverse because the government didn't prove wire fraud. The evidence in this case showed that Baltimore police officers filled out and submitted paper overtime slips the government contended were false and fraudulent. When the government introduced those slips, they also introduced evidence that later in the process, much later in the process, interstate wires were used. But there wasn't any connection made and there was any link between any conspirator and the use of the wires. They offered no evidence that any of the conspirators knew or could reasonably foresee use of the wires. Can I ask you, if I understand what the record showed on that, the officers put in these slips, paper slips, and they gave them to a supervisor? Well, they were approved, yes. And Jenkins was one of the level approvals. And then Jensen, the special agent, testified that Jenkins had direct contact with the system and that the approvals were a couple of days later wired to South Dakota. And of course, there was no question about the wirings to South Dakota, but there wasn't anything in the record showing any knowledge or foreseeability. Well, that gets to a little bit of a different issue. I just wanted to know whether, regardless of the officer's knowledge at this point, whether their action put a string of events that involved transmissions in interstate commerce. The officers handed in paper and several steps down the line there are wirings. Well, there are different people who talked about the process and the levels of the process. To me, it wasn't clear how many people looked at it. There could have been Jenkins and then a supervisor, but clearly it was punched into a computer by a lady. I forgot her name. And the special agent testified to what the documents showed. He said Jenkins interfaced the system. And we had another fellow, his name was, let's see, one of the officer would talk about engaging the process and he said it took two weeks at least to complete the process. He was describing this, referring to this process. He didn't describe it in detail. So the real question is, I think, and I think it's the dicier question, is your suggestion that there may have not been foreseeable that the officers knew of the interstate nature of the transmissions. But I think objectively, setting aside the interstate commerce. Your Honor, we don't dispute all the testimony of Mr. Matz, the fellow from ADP who said, yes, this stuff went out to South Dakota. What's missing here, Your Honor, is the link between any of these officers and the several steps down the line in which a wiring was made. The link has to be there because if they put in the overtime and then South Dakota processes it and gives them the paychecks. But there was nothing in the record, Your Honor, demonstrating that for these conspirators, for any of the conspirators, which is what's relevant to the direct hearing acts, that it was foreseeable to them that the wires would be used. All they knew is they handed in the slips and they get paid. There wasn't anything establishing that. Well, they knew that handing in the slips would be reflected in their paychecks and in the process. And we know that the paychecks were under Burfoot. That is not the same level of foreseeability. And Burfoot, you were talking about the deputy treasurer, the chief deputy treasurer of the city, who was fully familiar with the processes of payment and the use of the credit cards, knew how that worked. And therefore, the court held that it was foreseeable to him that the wires would be used. That kind of evidence simply isn't present here. This is much more akin to the Bents case from the Third Circuit, the Walters case from the Seventh Circuit, and the question that Judge Easterbrook posed. And if I could reframe it here, what was it about these paper overtime slips that should have led a reasonable police officer to foresee the use of the wires? And we submit that if you've taken... Go ahead. Suppose I'm inclined to agree that it wasn't foreseeable that there would be interstate wires, if you're working in a city police office. But what about the evidence that made it foreseeable for the officers that there would be wire transmissions? If you're working in a police office, there's multiple precincts, there's multiple districts, which presumably all have offices where the officers are turning in these paper slips. They might even just be communicating within the city with each other or within the state, maybe to a state bank to get foreseeable here. There's just nothing in the record about that, Your Honor, in terms of how any of that was known or foreseeable to any of these individuals. But they knew, I take it, that these paper overtime slips were going to someone who was entering something in a computer. That's not in the record, Your Honor. Yes, it is. Agent Jensen says that Jenkins turned them into the system. And he said they were submitted on paper time records and also time records were created, he said, e-time from ADP. And then after this data were received at ADP, it issued checks and most commonly directed deposits into electronic accounts. With respect, Your Honor, I think what Agent Jensen is saying there is that Jenkins' turn slips into a timekeeper. He said he used the word system. Well, I think she was speaking loosely there, Your Honor. There isn't anything there suggesting the level of agent She had their documents there which showed it and had his name on them. And she also said that the approval was done by the supervisors that were sent in by wire. Again, Your Honor, I don't think that any of that goes to the knowledge or foreseeability of any of these conspirators that the wire is providing. So you're saying that a person has to have technical knowledge of how wires are used in a communication? I mean, they have to know exactly a payment processing system before they can use the wires for that purpose? Your Honor, what's in this record is nothing about how these conspirators could have foreseen that the wires were going to be used. Again, as far as these conspirators are concerned, the record evidence stops at the point where something gets handed over to a timekeeper. There was nothing about any interactions between the officers and the timekeepers. There was no officer testimony about those interactions. There was no timekeeper testimony about those. There was nothing there. What about Officer Wood? He said he turned these time slips and then they were processed by the system. But that doesn't show, Your Honor, we submit any evidence about what he knew about how the system worked. The system could just as easily be somebody writing a paper check in a ledger. But they didn't because somebody testified to the fact they gave it to a clerk who put it into the computer. Aren't we talking about reasonable inferences here? And why isn't it a reasonable inference that in the time frame these crimes happened that computers would be used to make these communications rather than somebody typing a check in the Baltimore City office? Your Honor, we submit that the lessons of cases like the Pence case and the Third Circuit and the Walters case is that that's an inference too far. evidence showing the knowledge or foreseeability on the part of these particular conspirators. Now, if I could stay on the theme of jurisdictional elements, we submit that the Hobbs Act account should be reversed because the government proved a robbery of private individuals in a private home, but they didn't prove it was related to any specific business involved in interstate commerce. Their victim, Mr. Hamilton, testified. I guess I'm interested in your response. The allegation was that the money was involved in a used car business, which was involved going to auction in Pennsylvania and other places. Mr. Hamilton testified he had four different businesses, assisted living business in Maryland, rental properties in Maryland, gambling in Maryland, and cars that he bought in Maryland and sometimes in Mannheim, Pennsylvania. But the record was very vague about where any of the money in the house came from. He said that stolen money came from gambling and cars. He said he had just won something like $40,000 from the casino during Appendix 945. We submit that the level of specificity in Mr. Hamilton's testimony was simply not enough to prove beyond reasonable doubt that the cash came from the car business. Can I ask a question just to clarify your argument on this? If we think that the government, taking the evidence in the light most favorable to them, that they've established a nexus with the used car business, do you dispute that that is sufficient for the commerce clause nexus? Or would you say if the evidence shows that the connection between the money and the car business was demonstrated, that that's sufficient for the commerce clause nexus? Your Honor, then I think we're still in the realm of the Wang case now, the Sixth Circuit, which of course his court has cited twice with approval that this is potentially a de minimis amount of money. We don't know how much money was taken from the related in any way to the car business. In the Wang case, which his court has cited, the Sixth Circuit reversed it. Isn't that also true about the drug dealers, though? And we know that when you rob a drug dealer, that's a sufficient nexus. But we don't know how many of those dollars were meth dollars and how many of those dollars were legit dollars. Well, we do know that in Taylor there wasn't any dispute that all of the money, all of the things that were stolen were the result of the drug business. We simply don't know what year it was stolen had any connection to the used car business because of the vagaries of Mr. Hamilton's testimony. Finally, Your Honor, with regard to the KELP-2, if the court were to strike the – We have to go quickly here. You're going through a red light here. Go ahead. Go ahead. There are four racketeering acts. As to one of them, the government acknowledged in closing argument that it was extortion, not robbery, because consent. As to several of the others, the government's theory is based on accomplice liability, but they never asked Judge Blake to give an instruction on accomplice liability under Maryland law, and she didn't give one. And I'll reserve the remainder of my time. Okay. Thank you. You've reserved some rebuttal time. All right, Mr. Stitchell. May it please the Court. My name is Mark Stitchell, and I represent Marcus Taylor, who is also an appellant in this matter. Mr. Berman has addressed the initial issues for both appellants, and I'm going to address the issues in the brief that deal with matters of discretion where the court abused its discretion in denying various motions filed by the parties. First, this case was one that had incredible pretrial publicity. This was covered not only in the local print media. It was covered in the electronic media. It actually was covered in the national media. Prior to trial, Mr. Taylor's counsel moved for a continuance, and the court denied that, and we believe that was an abuse of discretion by Judge Blake. The next thing was the parties had moved in limine to limit the government from having witnesses refer to the term robbery. And this is a very important motion because, as addressed in the brief, both defendants were convicted on the basis that they had committed robberies. Based on the record in the case, and I'm not going to analyze each one, that there may have been thefts, there may have been burglaries, there were not robberies. However, throughout the trial, witnesses used the term robbery, which I believe infected the case, and it was an abuse of discretion by the judge not to grant that motion in limine. Finally, we get to the most egregious event in the case, and that was the outburst by Ronald Hamilton. Ronald Hamilton, when being questioned by Mr. Taylor's counsel without any lead-in, just erupted into this incredible outburst with profanity sprinkled throughout. The counsel tried to break into control, and it couldn't be controlled. It was at the end of the day, so the jurors were left with this incredible profanity-laced outburst that prejudiced both defendants in the case. The next morning, counsel for both parties moved for a mistrial, and if you read Judge Blake's consideration, she pretty much acknowledges this was a very serious outburst. However, she decided, rather than to grant a mistrial, that she would just strike the testimony and give a very, very brief caution to the jury. And I think in light of this very serious, serious outburst, that that was not sufficient to create, to dispel the significant prejudice that the parties had suffered. Finally, there's a final issue raised in the brief, which is a Brady violation involving Antonio Sandoval. The government did not disclose, during the trial, that Mr. Sandoval was under investigation for cocaine distribution by the same U.S. Attorney's Office that had prosecuted this case. We believe that that was a Brady violation, and that the court should have granted a new trial on that. Finally, Your Honor, with respect to the Hobbs Act robbery count, Mr. Taylor was convicted for the, convicted of robbery in Porter E. Stevenson. The Stevenson case has very interesting facts, because there are basically two events in the case. First, Mr. Stevenson's den was stopped by officers. During that traffic stop, Mr. Taylor was very much a passive observer. Then, Mr. Stevenson's keys were taken. Wasn't there testimony that Mr. Taylor collected the money from Stevenson's vehicle and then turned in less than the full amount of the money later? Your Honor, I believe there, I don't believe it was actually turned in less amount at the initial stop. Mr. Stevenson testified he thought he had $21-something thousand, and what was turned in was $15,000. You're correct, Your Honor. But then the testimony regarding taking robbery goes with events that occurred at Mr. Stevenson's residence. At that point, Mr. Stevenson was not president at the residence. In order to have robbery, there has to be a taking of personal property from a person. Right. In order to have robbery, you've got to take it from in the presence of the person. So your position then is that there couldn't have been a robbery at the residence, and so the robbery, if at all, must have occurred on the scene when they stopped Stevenson. Is that correct? Correct. And so you're saying that because money taken from the van was logged in by the police, there couldn't have been a robbery. Correct, Your Honor. Okay. What about the disparity in the testimony that they thought there was more money than that was, which was logged in? How do you account for that in your analysis? I don't think that's sufficient testimony to prove that there had been a taking of money by Mr. Taylor at that incident. So unless the panel has any other questions, I'm going to close. Thank you, Mr. Stitcher. Mr. Wise. May it please the Court, Your Honors. My name is Leo Wise on behalf of the United States. With me is Assistant United States Attorney Derek Hines, my co-counsel on this matter, and my co-counsel in the trial below. Daniel Herschel and Marcus Taylor and the other members of the Baltimore Police Department's Gun Trace Task Force victimized the people of Baltimore twice over. They robbed them, and by their crimes, they further undermined the public's confidence in the police. And more than any property, it will be the latter that will be the hardest to regain. The jury was presented with overwhelming evidence of the defendants' guilt, evidence of robberies committed by each defendant, evidence of overtime fraud committed by each defendant, and of a conspiracy involving both defendants and the other members of the task force that were prosecuted. Based on this evidence and the correct application of the law, the jury returned just verdicts. The issues raised by the appellants are without merit, and the defendants' convictions should be affirmed. If I may, Your Honors, I would start just at the last interaction with counsel for Mr. Taylor on this issue of the Stephenson robbery. I would first note that the argument that the robbery at the Stephenson's home at Heathfield Road was not a robbery was first raised in the defendant's, in the appellant's reply brief. It was never raised in the opening brief, so we did not have a chance to address it. I think for that reason it is waived. But in spite of that- Well, you're not saying there was a robbery at the house, are you? We are. Why? Who was robbed? Mrs. Stephenson. No, they told her to go into the living room. And she, and in Ball, which is a court of appeals case in Maryland, the court of appeals held that under Maryland law, the robbery, the victim does not have to be in the same room of the dwelling. Well, no, they don't have to, but the victim has to relinquish the property under force or threat of force. Don't they under the common law? They do, and she was directed to leave the house, and she was put in fear. A reasonable person would be put in fear that if they resisted the police, force could be applied against them. You're saying she surrendered her property? Exactly. And she even stayed within the curtilage to further the common law analysis of the property. Ward testified she sat outside of her own home. And I think that's directly analogizable to the Ball case where the victim, who was actually dead at the time, was in a different room of the house. She was actually outside the house when the safe was broken into, wasn't she? She was sitting outside the house, yes, Your Honor, after having been directed to leave by Officer Jenkins. She did not leave voluntarily. Her argument is that she was put in fear to have to surrender the money. Absolutely. The argument is that satisfies the common law. Absolutely. And the test is an objective one, and in addition to it being objectively reasonable that someone would fear if they refused a command from the police, force could be applied to them, even deadly force, there were multiple witnesses, including Sean Whiting, who said he feared he could be shot if he had resisted these officers, Herbert Tate, who said he knew these officers to be aggressive by their reputation and feared he could be beaten up, and other testimony beyond simply fear. Are you saying there was a robbery then when they logged the 15, right before they, from the stop and logged the 15,000? Yes, Your Honor. I think that's an additional, and the robbery is a continuous offense. I mean, he was, he had, the testimony was he had 21,000. That was what a half kilo. Well, Stevenson didn't really say that. He said he thought that's how much he was going to get out of the drug deal. Right. And then, and so what you're saying, it's a fair inference that there was more than 15,000 in there because Stevenson thought he was going to get more from selling the drugs. And that's about as good as your evidence gets on that, isn't it? Right, because the reality is they interrupted the drug deal in progress. Stevenson had the half kilo. The other guy had the money, which Stevenson believed was going to be 21,000, and on cross he was pressed on this, and he said, well, you know, how do you know? And he said, well, I don't know, but he said people didn't short me. I mean, there was additional evidence that he had a good reason. He had an expectation of the money. And I think on that basis the jury could infer that that was also a robbery in addition to the money that was taken from the home after Mrs. Stevenson was going to be out. Can I ask you a more cosmic question? Yes, sir. We had Herschel, I think, was found guilty of eight racketeering attacks and Taylor six. If we knocked out two or three, does that make any difference for purposes of count two? So I believe Herschel was convicted. You're right, Your Honor. The racketeering acts grouped into robberies and overtime. I think it was four robberies for Herschel, three robberies for Taylor in count two. Four and four and three and three. Right. So if we agree with you on the wire transfer that the interstate aspect of it is jurisdictional only, then we don't worry about the other robberies that are being used as RICO predicates, do we? That's right, Your Honor. The jury's conviction could be sustained only on the wires. The statute requires at least two. Yes. And so when the jury finds eight, that's surplusage. Is that your position? A very terrestrial answer to your cosmic question is yes, Your Honor. Eight is greater than two. That wasn't my question. I figured that one out. And on this question of the interstate wires, it is our position that it was absolutely reasonably foreseeable. Elaine Harder, the director of fiscal services, testified that the practice and the ordinary course of business is one of the phrases that's used in the Burford case that Your Honor, Judge Keenan, presided over. She testified that the officers themselves would take their slips to the unit's timekeeper and the timekeeper would enter them into the e-time system, the very system that produced the wires that were charged. It's true that Special Agent Jensen said Jenkins had to approve them, but the record evidence from Harder is it's the officers themselves that interacted with the timekeeper and the electronic system that produced the wires. And that's why this is like Burford. In Burford... Who testified to that? Elaine Harder, the director of fiscal services, and that's at Joint Appendix 436 to 437. And Raham at JA 577 and 629, Hendricks at JA 462, and Ward at 287 all said they turned in slips, dropped slips, used language that indicated that they interacted in this process. I guess that's maybe where I'm getting hung up is I see them turning the paper slips into the person who then puts it in the electronic system. But your brief says there's evidence to show actual knowledge of wire transmissions by the officers, and the officers aren't the ones who are putting it in the system. This is an office where there's a physical paper roll book that their attendance is kept in, and they physically write down on paper slips their overtime, and there's not evidence about these particular officers, how they were paid. For all we know, they were paid with paper checks. So what fills in this link between handing in the paper overtime slip to someone who's sitting at a computer and then the officer's ability to foresee that that's going to result in a wire transmission and not just something being put in a spreadsheet and then a check being printed out? We do believe there is actual knowledge from the fact that these are senior officers that would have had perhaps hundreds of occasions to interact with the timekeeper and see the system, but all the jury had to conclude was that there was reasonable foreseeability. And in the Ben's case, the Third Circuit said, the content of reasonable foreseeability must inevitably keep pace with advances in technology and general awareness of such advances. So I think in 2019, the idea that this was a stand-alone, non-networked computer... Yeah, no, I think you're probably right. It's hard to think that you would have a system that's just not connected to any sort of network in this day and age. But it also was surprising to me that they keep their attendance in a paper roll book. It was surprising to me as well. So I'm not sure how much we can infer based on the evidence here. It seems like it would have been really easy to put in evidence that would have been sufficient, but what evidence do we have to get us over the line? We can't just make assumptions. I think it's that they directly interacted with this timekeeper. If they had put the paper slip in a slot in the wall, or if they'd given it to a clerk and it vanished and they didn't know what happened. But the hardest testimony is they bring it to the timekeeper, and the timekeeper enters it into the system. And I think on that basis, it's reasonable to foresee that there will be wires in a large organization. We're a relatively small city, but have one of the largest police departments in the country. In a large organization for senior officers to foresee that there would be a wire. This is a little more of a technical question. It's a follow-up of Judge Rushing's. There is a foreseeability of using wires, and the defendants make the argument that they had to have knowledge of some interstate aspect of it. The Second Circuit is the only court I've seen to address that particular issue, and they said the interstate aspect of it is jurisdictional, and you don't have to have knowledge about the interstate aspect of it. The crime is committing a fraud by submitting signals, by putting in the papers and having them go into the system. Is your position to read Burfoot to suggest that the knowledge has to not only be of transmissions or causing transmissions, but also that the transmissions have to be in interstate commerce? Your Honor, I think our position would be the better view is that they don't have to have knowledge of interstate transmissions. That's a jurisdictional issue. It is. It's almost impossible, to Judge Keenan's questions, how lacking some deep technical knowledge, but also to Judge Rushing's questions, in this day and age, I don't know what an intrastate wire would look like, where even a local server is backed up to a data farm, and who knows where that is. It's just the technology advances to a point where I think that is part of the reasonable foreseeability calculus. I would also say I think the difference between Burfoot and Benz is this, and this gets back to the questions you posed, Judge Rushing. Burfoot was an insider and knew how the Treasurer's Office worked, even though he wasn't the person that directly interacted with the clerk that processed the credit card payments, but he worked there. Benz was an outsider that was selling scrap metal to the scrap yard, so he didn't know how they worked. These officers were insiders, and like the person, like the co-defendant in Burfoot, that actually interacted with the clerk that processed the credit card payments, these officers, by Harter's testimony, directly interacted with the timekeeper. So just like Burfoot could have been attacked as, well, how do you know submitting your credit card is going to generate an interstate wire, to your question, Judge Niemeyer, how do you know that's not just going to go to the credit card company down the street and then to your local branch bank at the other side of town? I mean, the wire fraud statute would be defeated by these arguments if we were to draw them out to their logical conclusion. But I guess interacting with the timekeeper doesn't tell me anything about what they would have known about how the timekeeping system works. Is there any evidence that they knew anything about e-time or whatever it was called and how it functioned? No, and I think that's, again, a reflection of a large organization where they took their slips to someone who entered them into a computer. Right, it wasn't their job. And it just couldn't be. Do we have any cases, and I understand your argument on the interstate nature being jurisdictional, and I think the Ninth Circuit in Ginian kind of laid out the analysis that you're giving us today. But my question is, do we have any other circuits that have said what you're asking us to say today, and that is, in this day and age, it is reasonably foreseeable that the wires will be used in any commercial transaction in which the information is put into a computer. Do we have any courts that say that? Because I think that's what you're asking us to hold. I think the court doesn't need to go that far based on these facts. I think the fact that it was an electronic timekeeping system in a large organization, that it is reasonably foreseeable that an electronic timekeeping system in a large organization would generate wires. I thought there was a lack of evidence in this case, so it seems to me it would have been really easy for you to put on a little more evidence, you know, talking about how the system works, and not just that the slips were handed over, but how did the system work, you know, rather than asking for a lot of inferences to be made. I think, having been trial counsel, now appellate counsel, I think it's one of those, I think it's a very clever argument on appeal, but I think it's the way the evidence came in. It's hard to describe in the courtroom the way the jury, and I think this is why the standard of viewing the evidence in the light most favorable to the government, all the reasonable inferences, the way the testimony came in from the officers who testified, I think supports the conclusion that they knew how the system worked, without going into great detail about its technical aspects. Let me ask you something, if I couldn't jump subjects. You know what really bothers me in this case is allowing the witnesses to keep referring to robberies, and then the jury is asked to determine whether robberies occurred. You know, that is the one thing that leaps off the page for me in this case. I'm not, I don't, I think it's a close question perhaps, whether you would reverse a conviction on this, but it just seems so flagrant to allow the witnesses to talk about a completed crime, and then you ask the jury to decide whether the crime's been committed. Could you address that? Sure. I mean, the first thing I would say, Your Honor, is both Counsel for Taylor and Raham referred to these crimes as robberies, which again in this kind of, it was a surprise to then see that in their argument. Counsel for Herschel during his cross-examination of Raham said, quote, when he was talking about the Hamiltons, and that's a robbery, right? No question about it, to which Raham responded yes. And Taylor, his counsel, in asking Raham about a woman named Tamara Daniels, who Raham said he robbed drug dealers with, said, quote, she would let you know when she was out with drug dealers where you could go and rob them. So this was not, they filed a motion. Are you saying this constitutes a waiver? I think everyone. You argued that? I think it evidences the fact that this was not an issue. They are trying to make it. Have you argued waiver? I don't believe we argued waiver. I don't believe I argued waiver. But I think the background issue is every officer admitted that they robbed people. Those were the predicate acts that underlied their conviction. They admitted that they took money by fear from people, forcing people to relinquish their money because of fear, threats of force, or use of force. Robbery is a legal conclusion. But their plea, I mean, the factual statements to their plea agreement said they robbed people on multiple occasions. That was the fact, apart from the legal conclusion. That was how they described it. And it practically. So, yeah, are you, I'm cutting you off. It seems to me that your best argument here is that the better practice would not be in front of a jury, lay people who are not familiar with the distinctions, not to refer to these as robbery, but it wasn't an abuse of discretion on the district court's part. Are you telling us that you would advise lawyers to try a case this way, to refer to the completed crimes the jury was asked to consider? I don't know how they could have described their actions. Factually, what they did. And if you ask them that, which we did in each case, they said I robbed people. Well, you prepare your witness. To say, did you put people, it's like a drug, when someone who sells drugs testifies against a co-defendant. Did you take money from these people? And under what circumstances did you take money? I won't belabor it, but I think that's a concern maybe that your office needs to think about. Your Honor, again, I think if this had been the issue that the appellants were making it on appeal, their own lawyers would never have used those words. And they did. All right. Anything else? If I could just make a brief comment. Sure. Thank you, Your Honors. The evidence, again, presented against the defendants crossed over from enforcing the law to breaking it was overwhelming. The district court's rulings properly applied the law, which they were not above. And for all those reasons, the jury's verdicts of guilt should be affirmed. Thank you. All right. I think our next person in order would be Mr. Berman. Thank you, Your Honor. I can begin with, Your Honor, Mr. Weiss. It's colloquy concerning arithmetic. Our position, obviously, is for count one, two minus one equals one. No, I understand. You need at least two on count one. That's a conspiracy. My question was on count two, which is actual racketeering, and you only need two, and they found eight with respect to Herschel and six with respect to Taylor. My question was if we were to say it actually is six with respect to Herschel and four with respect to Taylor, there's still no problem on count two. Our view on count two is that eight minus knocking out four wire frauds minus knocking out three, at least three of the robberies, would put them below the two. But you do have to get below the two. Absolutely. Okay, I understand. Now, it's notable that Mr. Weiss acknowledged in response to questioning that there wasn't any proof presented about these officers' actual knowledge of the e-time system. And I think what we've heard here is a lot of speculation about what these officers knew or what was foreseeable to him, but very little about the government's actual proof. It's notable, Your Honor, that in the government's closing argument, this is what they said about the interstate commerce element, the interstate wiring element, that Mr. Matz flew into Baltimore all the way from Atlanta, testified that ADP's center is in Sioux Falls, South Dakota. That element is met. They didn't even address or analyze the question of knowledge or foreseeability. I think it's because they took it for granted and they didn't prove it. And, you know, they rely on the testimony of Ms. Harder, but Ms. Harder wasn't there in any of the police stations or headquarters. She's simply describing a process. Ms. Harder's testimony is not sufficient to show that any of these officers have any knowledge or there is foreseeable to them how this e-time system worked when they actually handed in paper overtime slips. And, again, the government's witnesses from beginning to end talked about this as being a paper system, and we submit that there simply isn't any evidence that they knew how the system worked or it was foreseeable to them how the system worked. And, again, I repeat the question from Judge Easterbrook in the Walters case, what was it about these papers that should have led a reasonable police officer to foresee use of the wires, and we submit that there wasn't any such thing. And, Your Honor, the same point holds, I think, with respect to the commerce element where they asked in closing argument, Mr. Wise said, what is the central question in this case? Is it how did Ronald Hamilton make his money, or was it was Ronald Hamilton's money taken? That's the central question. How the money was made doesn't matter. And, in fact, it does matter whether or not they proved that the money taken from the Hamiltons related to the car business in interstate commerce or the other three businesses as to which no connection was made. I see that my time is up. We ask that the Court reverse on all three counts. Thank you. Thank you. Mr. Stichel. When I was up here initially, Judge Rushing had asked me a question regarding the Stevenson stop and whether there was a proof of a discrepancy in the amount of cash that was allegedly taken from the van and then turned in by Officer Taylor. And I would just direct the Court to page 865 of the Joint Appendix, which is the testimony of Mr. Stevenson. In cross-examination, he was asked, and the money that you expected Mr. Brown to have was $22,500, correct? Right. Correct. But you yourself didn't have personal knowledge. Answer. I didn't see the money. No. Question. Right. No, you didn't actually know how much money he had in the bag that day because you didn't see it. Right. Answer. I didn't see it. So I don't believe there is sufficient testimony to prove or to allow a jury to have an inference that there had been more money in that bag than was turned in. Let me ask you this. And I must say I'm not recounting the evidence, so this is more hypothetical than the evidence. But if there's a transaction for cocaine where the price for the transaction is agreed upon to be $21,000, or that's the market price, and the money is handed over and put in a bag, and the officer says, I wasn't shorted or I was never shorted, this is an after the fact now, he knows that it doesn't happen in the street, can't a jury draw the inference that he received $21,000? I don't think you can draw an inference here where the witness claims that he had no actual knowledge of what was in there. Your Honor, I would have to go back. Suppose somebody hands you a roll of money, $21,000 for the cocaine, and you cross-examine him and say, did you count the money? And he says, no, but I've dealt with this guy for a long time. He's never shorted me. And $21,000 was our price. Can't a jury draw the inference that that was $21,000? I don't think the jury can, Your Honor. Okay. And then I would also like to address the second part of this incident, which was the taking of money from the Stevenson residence. In order to be a robbery under Maryland law, there has to be a taking from someone's person. Do you agree that they committed a burglary? Yes, yes. I will acknowledge that there is sufficient evidence that there was a burglary. I thought that Maryland, it doesn't have to be physically on their person. It doesn't have to be in their – basically, you can even be in the same house but not be in the same room, but you have to put somebody in fear and take the money based on surrendering, based on fear. Wouldn't that be robbery? But here – No, no, I'm not – I'm saying it would be correct. It's a matter of law. Yes, if someone were in the house, but here Mrs. Stevenson was – She was on the front. She was not in the house. So I think that breaks the chain. She was directed to go there. And the question is, was that a product of fear? And a jury had to answer that question. But as I say, I think the causal connection is broken there when she's outside the house and in this property is found later. So in any event, Your Honor, unless you have further questions, I would also ask the Court reverse. Thank you, thank you. Mr. Berman, I understand you're court-appointed. Yes, Your Honor. I do want to acknowledge that service. As you know, it's valuable. We value it. And you did a fine job, so I want to thank you. Thank you.
judges: Paul V. Niemeyer, Barbara Milano Keenan, Allison J. Rushing